[No. 3753.]

CREIGHTON ET AL. V. CAMPBELL.

1. TRIAL—*Right of Parties to Proceed Under the Issues Presented by the Pleading.* The complaint set up a contract between plaintiff and defendant, and non-performance thereof, praying damages. As matter of inducement the complaint set up certain frauds practiced upon plaintiff by one not a party, but of which, as alleged, defendant had knowledge. Plaintiff having

failed to prove the alleged contract, the court denied defendant's motion for a non-suit, and against the objections of both parties directed the cause to proceed upon issues which the court declared were formed upon allegations of frauds practiced by one Hitchcock, and defendant's responsibility therefor. Verdict for plaintiff and judgment thereon. The complaint stating no cause of action upon which a personal, money judgment against the defendant for the frauds of Hitchcock could be predicated, the action of the court in changing the issues was held error.

2.   INSTRUCTIONS—*False Statement of the Pleadings,* prejudicial to a party, is error. (128.)

3.   —— *False Statement of the Evidence.* An instruction which impliedly assumes the existence of evidence which was not given is error. (130.)

4.   CORPORATIONS—*Directors, Officers.* The statute (Rev. Stat., secs. 852, 865), distinguishes between directors who are elected by the stockholders and officers who are elected or appointed by the directors. Of the officers only the president is required to be a director. (131.)

5.   —— *Stockholders—Right to Vote.* A merely nominal owner of the stock of a corporation is entitled to vote thereon. (131.)

6.   JUDGMENT—*Presumptions.* Plaintiff contesting the right of defendant to vote certain shares in a corporation which had theretofore been issued to one Hitchcock, and by him transferred to defendant, the jury were instructed that if defendant, at the time of the transfer, knew that the stock had not been paid for by Hitchcock, and knew also of certain frauds perpetrated upon plaintiff and the corporation by Hitchcock, defendant's claim of ownership of the shares would be evidence of fraud on the part of defendant. It appearing that in a former action in which the parties to the present suit, or their privies, were parties, upon the same allegations as to the shares, and the assignment thereof by Hitchcock, judgment had been rendered against Hitchcock and in favor of the corporation for $24,000.00, not declaring either the original issue of the shares nor the assignment thereof invalid, *held* it must be presumed that this judgment settled all issues, and left the stock outstanding in the hands of defendant as assignee of Hitchcock, to the extent, at least, that defendant was entitled to vote said shares. (132.)

7.   ESTOPPEL—*By Conduct.* One who, while a director of a private corporation, acquiesces in the assumption of the same position by another, knowing that he is not qualified by his holding of stock, is estopped to subsequently complain of such action by the disqualified person. (132.)

8.   MEASURE OF DAMAGES—*Duty of Court to Instruct As To.* Where a definite rule as to the measure of damages can be given, it is error not to instruct the jury as to such rule. (133.)

9.   —— *Action for Refusal of Corporate Stock,* to which plaintiff is entitled. The measure of damages is the value of the stock .(133.)

10. —— *Action for Deceit Inducing the Purchase of Corporate Stock.* The measure of damages is the difference between the actual value and what it would have been worth if the representations had been true. (133, 134.)

11. —— *Stockholders' Interest in Corporation—Value Of—How Measured.* The value of the stockholders' interest in the corporation is his proportion, measured by his holding in the stock, of the net assets of the corporation after the discharge of its liabilities. (134.)

12. TRIALS—*Jury Referring to Evidence for a Purpose Prohibited.* The jury were instructed to consider particular evidence only for such light as it might afford upon the acts of the defendants, alleged by plaintiff to have been done for the purpose of defrauding him. In fact, the jury considered the evidence for other purposes, and the verdict upon the question whether plaintiff was damaged at all by the acts of the defendants, was based upon this evidence. The judgment was reversed. (134, 135.)

13. DECEIT—*False Representations as to the Future.* A representation which is in effect a promise to be performed in the future will not sustain an action for deceit. (135.)

14. —— *Frauds of Another* afford no action. Nothing short of actual participation in the frauds complained of suffices to charge the defendant. (136.)

*Appeal from El Paso District Court.* HON. J. W. SHEAFOR, Judge.

Mr. SAML. H. KINSLEY, Mr. MARTIN M. BURNS, Messrs. CHINN & STRICKLER, and Mr. J. A. RITTER, for appellants.

Mr. J. F. SANFORD, Mr. E. C. STIMSON, Mr. J. W. SLEEPER, for appellee.

KING, J., delivered the opinion of the court.

Plaintiff filed his complaint, demanding damages in the sum of $40,000 alleged to have been sustained on account of the breach of a contract which he alleges was entered into by and between himself and Basil B. Creighton, one of the appellants herein, defendant below. From a judgment for $15,550 defendants appealed.

The complaint is exceedingly voluminous and involved. That portion of the complaint which alleges the cause of action upon which plaintiff supposed he had laid his right

to recover, and upon which he tried the case until the court made another issue for the parties, the cause of action which the defendants answered, and against which they made their defense, until the court required both plaintiff and defendants to proceed upon a theory which neither of them had proceeded on, is found in paragraph or subdivision 6 of the complaint, beginning in the 73rd folio thereof. Practically all the preceding allegations of the complaint are nothing more than matters of inducement leading up to and introducing the real cause of action, and explaining the reasons which led to the making of and entering into the alleged agreement stated in subdivision 6. The cause of action as set forth in said subdivision is, in substance, that, in consideration of the promise of the plaintiff herein to refrain from prosecuting a suit which he had theretofore commenced in the District Court of El Paso County (No. 8422), and to refrain from pressing his objections to a certain assignment made by The Manitou Bathing Company for the benefit of creditors of said company, and to the claims filed against said company in said assignment proceedings, the said Creighton agreed to purchase the property at assignee's sale; to immediately begin, and complete, a bath house, to cost not less than $30,000, on property belonging to said company, and thereafter convey the said property to a company to be organized by Creighton, with a capital stock of 250,000 shares of $1 each; and that he would issue or cause to be issued to plaintiff 30,000 shares of the stock of said company to be organized, and do and perform certain other acts fully set out and alleged in the complaint; that plaintiff had kept and performed, or was ready to keep and perform, the contract on his part; that Creighton had caused the said company to be organized, conveyed to it all the property mentioned in the agreement, had secured, or had control of, the capital stock; but failed and refused to issue any thereof to the plaintiff, and in other respects failed to comply with the terms of the con-

tract on his part, to the damage of the plaintiff in the sum of $40,000. The prayer was for judgment in that sum, and that it be made a lien on all the property of The Manitou Bathing Company, and of the new company (The Manitou Mineral Springs Bathing Company), to which the property of the old company, purchased at the assignee's sale, had been conveyed.

The matters of inducement alleged were, in substance, that in 1905 The Manitou Bathing Company, a corporation, was organized with a capital stock of $110,000; that the by-laws provided, as a qualification for each person elected as an officer of the company, that he should hold at least 1,000 shares of stock in the company, and that no officer should be paid a salary until the company should be on a paying basis; that the indebtedness of the company should at no time exceed $15,000, and that a vote of the majority of the capital stock should be necessary to authorize a mortgage or encumbrance of the property; that in the summer of 1906, one Daniel N. Hitchcock, an acting director, and the president and manager of the said company, falsely represented to the plaintiff that The Manitou Bathing Company was then the owner of a large amount of real estate at Manitou, Colorado, fully paid for and free of encumbrance, of the value of $50,000, which had been conveyed to the company by said Hitchcock, in consideration of the issuance to him of 56,000 shares of the capital stock of said company; that the remaining 54,000 shares had been set aside as treasury stock, to be sold at par, for the erection and equipment of a bath house upon a part of said real estate; that upon faith in these representations, plaintiff paid to said Hitchcock $21,200 for 21,200 shares of said treasury stock; that the said real estate had not, in fact, been fully paid for, but that much of the money received from plaintiff was used for paying for said real estate, instead of being utilized for the building of a bath house; that from the 7th day of August, 1906, until the 7th day of August, 1907, Campbell

and said Hitchcock constituted two of the board of three directors; that on August 6, 1907, plaintiff, defendant Creighton, and one A. M. Daggett, were elected a board of directors, and that on and after August 6, 1907, the defendant Creighton had knowledge of all the misrepresentations, deceit and fraud alleged to have been made and practiced by Hitchcock to and upon the plaintiff; that the said Creighton was not at any time the owner of to exceed 220 shares of stock in said company; that said Hitchcock never in fact *paid* for the 56,000 shares of stock, or any part thereof, issued to him in consideration of the transfer of said real estate; that on the 10th day of September, 1906, the said Hitchcock and one Stauffer, as directors, voted to borrow $1,500, and gave a trust deed of the company, on the company real estate, to secure the loan, over the protest of the plaintiff, and without authority of a vote of a majority of the capital stock; that on or about the 15th day of October, 1906, Campbell's wife, as a stockholder of said company, brought suit in the District Court on behalf of herself and others similarly situated, against the said Hitchcock and The Manitou Bathing Company, and the said Stauffer as director, in which suit The Manitou Bathing Company was made defendant, in order to protect the rights of the company, and stockholders, and because the company refused to bring the action; that in said suit all the representations and fraud perpetrated on the plaintiff, by said Hitchcock, as set forth in this complaint, were set forth, all of which matters, it is said, were fully known to defendant Creighton on and after the 6th day of August, 1907; that said suit proceeded to final judgment, and on the 25th day of January, 1908, resulted in a judgment against the said Hitchcock, in favor of The Manitou Bathing Company, in the sum of $24,308.59.

That on the 31st day of March, 1908, defendant Creighton and said Daggett, assuming to act as directors of the company, made an assignment of the company's property

for the benefit of its creditors to one T. J. Sandford as assignee, in which they claimed the total assets of the company were $15,305.10, and the total liabilities $18,593.18. Extended allegations are then made for the purpose of showing that the assignment proceedings were not valid, and that claims were filed, and allowed by the court, with the knowledge and connivance of said Creighton, that ought not to have been allowed; that while the said assignment proceedings were pending and undetermined, plaintiff herein began a suit in the District Court, being No. 8422, against the said Creighton, Sandford, the old·company ,and others, in which all the things in the instant case, except those set out concerning the agreement, were alleged, and which asked for an injunction restraining the allowance of the claims by the assignee, and to restrain the assignee from further acting, and alleged that summonses in said suit were served on Creighton, Sandford, and other defendants, in August, 1908.

We have not undertaken to state in detail every allegation of the matters of inducement, but in substance sufficient for our present purpose to show the nature of the allegations, and bring the statement of the pleadings up to subdivision 6, which pleads the alleged agreement upon which this suit is predicated.

The defendants' answer put in issue the misrepresentations alleged to have been made by Hitchcock, and denied that Creighton had knowledge thereof; admitted the assignment and denied its invalidity; admitted, or alleged, the sale of the property thereunder by the assignee for the purpose of paying the claims which had been allowed by the court; the purchase of said property at assignee sale by or for the defendant Creighton; the payment or settlement by Creighton of the company's debts out of the purchase price for which the property was bid in; the organization of the defendant The Manitou Mineral Springs Bathing Company; the transfer by Creighton, or his trustee, to

the last named company of all property purchased at the assignee's sale, for the stock of the new company; denied the agreement alleged in subdivision 6, as well as all the representations alleged to have been made by him, constituting or leading up to said agreement.

After plaintiff had introduced his evidence on the matters of inducement, and to support his cause of action on the agreement, and rested his case, defendants moved for a nonsuit, whereupon the court held that plaintiff had failed to prove the agreement, and that, in fact, the evidence showed the alleged agreement had not been made, but denied the motion for nonsuit, and, over the protest of both plaintiff and defendants, required the trial to proceed upon the issues which the court said were formed upon the allegations of fraud committed by Hitchcock, and Creighton's knowledge thereof, and stated that the jury would be instructed that the alleged contract had not been proven, and that the jury would not be allowed to take into consideration "any evidence of the negotiations looking toward the making of a contract as alleged in the complaint, except for the purpose of such light, if any, as it may throw upon the knowledge possessed by the defendants, or either of them, of matters preceding the time that it was alleged said contract was entered into."

In our opinion, the court erred in refusing to grant defendant's motion for nonsuit after holding that the agreement sued on had not been proven. It is clear that the issues had not been formulated by either party for the purpose of trying the case upon an issue of fraud, except as incidental to the agreement. We think the defendants did not waive the right to object to the trial upon such issues. If the complaint, except upon the agreement, may be held to state any cause of action as against the defendants upon which any judgment could be predicated, we think it does not state a cause of action upon which a personal money judgment against the defendants, or either of them,

upon the grounds of fraud alleged in the complaint, can be sustained. The issues were not submitted to the jury for determination upon any other ground than that of fraud, consisting of misrepresentations and deceit. The latter conclusion is made plain by the instructions, particularly instruction No. 6, defining fraud as used in this case. There is no allegation and no proof of any misrepresentations made to the plaintiff by either of the defendants in this case, and no proof of any misrepresentations made to or fraud practiced upon the plaintiff by said Hitchcock or ,The Manitou Bathing Company, with the knowledge, consent, or connivance, of the defendants or either of them, at or prior to the time the same were made, nor of which they had knowledge until long after the time that any damage suffered by plaintiff by reason of the misrepresentations, fraud or deceit alleged to have been practiced by Hitchcock had accrued.

But if the complaint be treated as sufficient as a cause of action for fraud, nevertheless, it appears that instructions given over the objections of the appellants are so prejudicially erroneous as to require reversal. The first instruction, which purported to state at length the issues made by the complaint, concludes by stating, as one of the allegations thereof:

"That all of the foregoing matters and things were done by and with the knowledge and consent and approval of said Creighton and the said company for the purpose and with the intent to defraud the said plaintiff, and in furtherance of the false and fraudulent representations made to said plaintiff by the said Hitchcock, and in furtherance of the fraud alleged by the plaintiff to have been practiced upon him by the said Hitchcock."

The sentence quoted is incorrect and erroneous in this: the matters charged in the complaint as having been done by Hitchcock were done in the year 1906. The defendant company was not organized until late in 1908. There is

no allegation in the complaint that such matters and things were done with the consent of defendant Creighton, nor that he had knowledge thereof, until on and after August 6, 1907, and no allegation that they were done with his approval, or that of his co-defendant. There is no allegation in the complaint that the matters and things alleged to have been represented by defendant Creighton were false, nor that his acts were done for the purpose or with the intent of defrauding the plaintiff, nor that they were made or done in furtherance of the false and fraudulent representations made to plaintiff by said Hitchcock, nor in furtherance of the fraud alleged by the plaintiff to have been practiced upon him by Hitchcock. One exception may be noted: It is alleged that defendant Creighton caused certain capital stock to be transferred to him for the purpose of defrauding plaintiff of any claims or demands plaintiff might have against said Hitchcock or The Manitou Bathing Company. But there is neither allegation nor proof that it accomplished that purpose, nor is there any prayer that such transfer be set aside or held invalid. This is not a suit against Hitchcock or The Manitou Bathing Company, nor in aid of a suit against them. Such a misstatement of the allegations of the complaint could not be otherwise than prejudicial to the defendants. The seventh instruction, after instructing the jury that the evidence failed to prove the agreement sued upon, further instructed them that the evidence introduced relative to *negotiations* looking toward the making of the agreement as alleged "may be taken into consideration by you solely and only for the purpose of such light, if any, as it may throw upon the alleged acts and doings of the defendants or either of them, *alleged by the plaintiff to have been done for the purpose of defrauding him.*" That portion of the instruction italicized continues and accentuates the error noted in instruction No. 1, as it erroneously assumes that, with the one exception noted, there were any allegations of any acts

done by defendants or either of them for the purpose of defrauding the plaintiff. Further attention will be called to this instruction later in this opinion.

By instruction 9 the jury were instructed that if they believed an omnibus list of things assumed to be alleged in the complaint, and that the plaintiff was damaged thereby, they should find against the defendants. Among said matters are the following: "That the said directors, including the said Creighton, borrowed $1,500 and gave a trust deed to secure the same upon a part of the said real estate of said Manitou Bathing Company," etc. There is neither allegation nor proof that the directors, including Creighton, borrowed said money or gave a trust deed therefor; in fact, both allegation and proof are that the money was borrowed and the trust deed given long before Creighton became a director. An instruction that impliedly assumes the existence of evidence which was not given is erroneous: *Bowling v. Chambers,* 20 Colo. App., 113, 122, 77 Pac. 16; *Fisk v. Greeley Elec. Lt. Co.,* 3 Colo. App., 319, 324, 33 Pac. 70. Another: That at said time (August 6, 1907), or at any time the said Creighton was not the owner of as many as one thousand shares of stock in the said Manitou Bathing Company, and that he could not become a director thereof under the by-laws of said company without being the owner of at least one thousand shares of stock in said company." There is no allegation in the complaint, nor proof, that under the by-laws the ownership of one thousand shares of stock was a necessary qualification for becoming a director. The allegation was that the ownership of one thousand shares of stock was a necessary qualification for becoming an *officer.* While the position of director of a private corporation is sometimes spoken of in a general way as an "office," the statute clearly distinguishes between directors who are elected by the stockholders and officers of the corporation who are elected or appointed by the directors. Of such officers, the only one

required by statute to be a director is the president. The evidence does not disclose that the by-laws made any like qualification as to a mere director, nor that the defendant Creighton held the office of president of The Manitou Bathing Company, or acted as president, or any other officer, in the transactions alleged to have resulted in damage to the plaintiff. But if we concede that the allegations included this qualification for a mere director, the proof here shows that from and after February 7, 1908, Creighton was holder of 56,220 shares of stock by transfer on the corporate books, and issuance to him of the certificates. It does not appear that the transfer to him was without consideration, nor merely colorable. Therefore, *prima facie*, he had the right to vote the stock and act as director, even though he was a merely nominal owner—*State v. Leete*, 16 Nev., 242; *Re Argus Printing Co.*, 1 N. D. 434, 48 N. W. 347, 12 L. R. A. 781, 788, 26 Am. St. 639. The *prima facie* showing was not overcome by the evidence.

As a part of said instruction 9, the jury were also told that if they believed the defendant Creighton claimed to be the owner of said 56,000 shares of stock of The Manitou Bathing Company, issued to Hitchcock under certificates 1 and 2, and that at the time of the transfer to Creighton of said shares he knew that the stock had not been paid for by said Hitchcock, and also knew, when he purchased the same, of the alleged fraudulent representations made to and perpetrated upon the plaintiff by said Hitchcock and The Manitou Bathing Company, such claim of ownership by Creighton would be evidence of fraud. It is not alleged nor proven that Hitchcock did not cause the real estate to be conveyed to the company before he assigned the stock, or it came into the hands of Creighton. The evidence shows that when Creighton was first elected director by the use of that stock, it was voted by his assignor, the assignee of said Hitchcock, and that at the time he claimed to be the owner thereof and voted it, it had been duly assigned and

issued to him.    Furthermore, the complaint alleges, and
the evidence shows, that another suit, to-wit, suit No. 8046,
had been prosecuted in the same court, in which the parties
to this suit, or their privies, were parties, and in which the
allegations were the same as the allegations made in this
suit relative to the treasury stock, and also to said 56,000
shares of stock, and in which one of the issues made was
that said 56,000 shares had not been paid for by Hitchcock,
and was invalid, and that Hitchcock's assignment thereof
was also invalid.    The evidence shows that after full trial,
judgment was rendered against said Hitchcock for $24,000,
to be paid to said The Manitou Bathing Company, on an
accounting for the stock as well as other funds, but which
did not purport to invalidate the original issue, nor the
subsequent assignment of said stock, nor enjoin the transfer
thereof.    Therefore, in the present state of the record, the
presumption must be indulged that the money judgment
settled all issues, including the prayer for permanent in-
junction, and left the stock outstanding in the hands of
Hitchcock's assignees, including Creighton, valid, at least
to the extent that such assignees had the right to vote the
stock.    In the condition of the pleading and proof, the sub-
mission of that question to the jury was error.

Moreover, although plaintiff was a **director, he did**
not at any time object to Creighton's acting as director or
officer on the ground that he was not qualified by the amount
of his stock-holding.    Is he not now estopped from objecting
on that ground?—Cook, Stock & Stockholders, section 523,
p. 851.

Again, the jury were instructed that if they believed
that "all of the foregoing matters and things," being all
the matters and things assumed to have been set forth in
the complaint, were done by or with "the knowledge and
consent of the said Creighton and the said company, and
with the intent to defraud the said plaintiff, and in further-
ance of the false and fraudulent representations made to

plaintiff by said Hitchcock, and The Manitou Bathing Company, if any were made, and in furtherance of the fraud alleged to have been practiced upon him by the said Hitchcock and The Manitou Bathing Company, if any there was," etc., they should find for the plaintiff. For reasons already given, this portion of the instruction of itself would be quite sufficient to require a reversal. We doubt whether many, if any, of the matters alleged as the fraud of Hitchcock are material or competent to sustain the cause of action against defendants upon which judgment was rendered.

We think the court committed error in giving instruction 10, in that it did not give the proper measure, or any measure, of damages. That instruction is as follows:

"If you find for the plaintiff, you will assess his damages at such sum as you may find has been proven by the evidence, so as to fully compensate him for the damage sustained, and no more, and not in any event to exceed the sum of $40,000."

The law seems to be settled in this jurisdiction that in cases of this character, where a definite rule for the measure of damages can be given, it is error in the court not to instruct the jury as to such rule.—*Mustang Res. Co. v. Hissman,* 49 Colo. 308, 112 Pac. 800; *Colo. Spgs. Co. v. Albrecht,* 22 Colo. App. 201, 123 Pac. 957. In the complicated and confused state of the pleadings and record, it is argued that three causes of action are included in one count of the complaint, namely, (1) an action for breach of express contract, (2) an action for damages for fraud and deceit practiced by Hitchcock on the plaintiff, of which defendants had knowledge, (3) conversion of plaintiff's property by defendants. Under the first cause of action it is clear that the measure of damages would be the value of the capital stock in the new company, which plaintiff alleges he was to receive under the contract. Under the second cause of action, the measure of damages would seem to be the difference between the actual value of the stock

and what it would have been worth if the representations made by Hitchcock had been true.—Thompson, Corp., 2nd ed., vol. 1, p. 700, and cases cited; Smith, Law of Fraud, section 299; *Van de Wiele v. Garbade,* 60 Ore. 587, 120 Pac. 752. Under the third cause of action, the measure of damages would be the value of the property converted by the defendants; but in this case the property alleged to have been converted was the property of The Manitou Bathing Company, in which the plaintiff was a stockholder. The value of plaintiff's interest therein would be the value of his proportion (measured by his stock-holding) of the net assets of The Manitou Bathing Company after all its debts had been paid. These contentions make manifest the necessity for instruction as to measure of damages. If we were to concede—which we do not—that the evidence was sufficient to justify instructions as to measure of damages on the last two causes of action, nevertheless, no rule for the measure of damages having been given, but the jury left to determine the limits of compensation from conjecture, without reference to legal rules, the verdict cannot be sustained.

Attention has been called to instruction No. 7, under which the jury were not permitted to consider the negotiations looking toward the making of the agreement alleged in the complaint, except for the purpose of such light as it might throw upon the acts of the defendants alleged by the plaintiff to have been done for the purpose of defrauding him. It is plainly shown by the answer made to special interrogatory 2 that the jury not only considered said negotiations for other purposes than that directed, but that their decision of the entire question as to whether plaintiff was damaged at all by defendants' acts was based upon such negotiations. Special interrogatory No. 2 propounded to the jury, and the answer thereto, are as follows:

"Question 2. If you find from the evidence that the plaintiff Campbell has been damaged by the acts and doings

of the defendant Creighton and the defendant Mineral Springs Company, or either of them, how was the said Campbell damaged?

Answer. Plaintiff Campbell was damaged by relying on representations made to him by Creighton and J. K. Vanatta looking to an equitable settlement of the Manitou Bathing Company and refrained from presenting or pressing his claims against said company in court."

As has been said, consideration of the agreement alleged was taken from the jury. That agreement, however, so far as established, consisted of the negotiations and representations "looking to an equitable settlement" of all matters concerning The Manitou Bathing Company. Therefore, it appears by said answer that the jury not only considered the negotiations for other purposes than that permitted, but that they treated such negotiations as equivalent to an agreement under which the plaintiff had a right to refrain from pressing his claims, which was directly prohibited by such instructions. Moreover, a representation which constitutes a promise to do something in the future will not sustain an allegation of fraud and deceit.—Smith, Law of Fraud, section 7. Furthermore, it would be absolutely impossible for the jury, or any one else at this stage of the proceedings, to determine what result would have followed the pressing of such claims against the assignment, and therefore there could be therein no foundation for estimating the damages.

We have considered only a few of the objections urged, but we think it unnecessary to mention others.

In this case, as in many others, it is strongly urged that, although errors may have been committed, nevertheless, as it appears that the verdict is not excessive, and that substantial justice has been done, the judgment should not be reversed. But, although we may agree that the verdict is not in apparent excess of the plaintiff's probable loss sustained by reason of his trusting in Hitchcock's repre-

sentations, yet it is impossible to concede, under the state of the record, that Creighton can be held liable personally for Hitchcock's fraud. Nothing short of actual participation in such fraud, or its legal equivalent, can make him so liable. His status as a *particeps criminis* is not shown.

Moreover, the civil code and the rules of practice adopted by the Supreme Court are intended to provide, and do provide, an orderly procedure designed for the purpose of making up issues for trial and for the conduct of trials. The right to insist upon a substantial compliance with these provisions of the code and rules is the right of every litigant, and the denial of such right is the denial of a substantial right. In this case it is clear that plaintiff and defendants alike construed the issues made to be upon the alleged agreement, and defendants formulated their answer to meet that issue, and that only. We think that was the true construction. But when the court took that issue from the jury and directed the trial to proceed upon other issues not understood by the parties to have been made, the trial ceased to be an orderly presentation of evidence essential to the controversy, to such an extent that the learned trial judge, in desperation, declared that he would no longer attempt to limit the introduction of testimony to that which was admissible, but would let the parties "make it as ridiculous as possible on both sides." It would be difficult to conceive of a more chaotic and unsatisfactory state of the record than is here presented. This condition is emphasized by the defendants' answer, formulated, as we have said, to meet certain issues, and under which no agreement was reached by court and counsel as to what allegations of the complaint were denied or put in issue, and by the fact, clearly outstanding, that the plaintiff had little first-hand knowledge of the testimony that was necessary to support his complaint in the many matters affecting the defendants. Much of the testimony which he did give was elicited by his counsel only after verbal castigation and the pressure of

leading questions, and which upon cross-examination was admitted to be based upon information derived from his attorney.

As to the cross-errors assigned, we think the court could not do otherwise than withdraw from consideration the agreement as it was alleged; but we are not satisfied that the court might not have submitted to the jury the question as to whether some agreement, consisting of a written proposal submitted by Creighton, and its verbal acceptance, with modifications, understood by both, did not constitute an agreement, or understanding, upon which both parties proceeded, and in reliance upon which plaintiff did in fact permit the assignment and the sale thereunder to proceed, not only without objection, but with his full consent and approval, and by reason of which the defendants in this case may be under obligations, in equity, to share with defendant the capital stock of the defendant company. We think the court did not err in charging the jury that for the purposes of this action, the assignment made for the benefit of creditors and the claims presented therein and allowed must be regarded as valid, whatever may be the rule in an action under the statute of frauds.

If this suit were in the nature of a creditor's bill, or to hold the defendants to an accounting as trustees, or a proceeding to hold the property involved to satisfy any judgment that might be obtained by plaintiff against Hitchcock and The Manitou Bathing Company, and all necessary parties were parties hereto, an entirely different question would be presented as to the materiality and effect of the evidence. The record shows that proceedings of that nature were instituted before the instant suit was begun, and are still pending; but they have not been consolidated with this, and cannot be considered as affecting the present case.

The judgment is reversed and the cause remanded for further proceedings in conformity with the views herein expressed.

HURLBUT, J., and BELL, J., concurring.

CUNNINGHAM, P. J., not participating.

*Reversed and Remanded.*

MORGAN, J., dissenting:

With deference to the view of my associates, I do not concur in the reversal. The judgment was just and, for this reason alone, it should not be reversed. The irregularities complained of occurred by reason of the desire to reach the truth at the trial, and not in a single instance did the lower court commit any irregularity that affected the substantial rights of the parties.

The majority opinion says the action is for damages for the breach of a contract; but the complaint and the evidence, from my view, were for damages on account of the fraud practiced upon the plainitff, the negotiations concerning the contract being only a statement of a part of the circumstances constituting the fraud charged. The complaint as construed by the court and the evidence comprise three charges of fraud, chronologically stated:

First, that plaintiff was induced, by the fraud and deceit of Hitchcock, to purchase 21,000 shares, by being led to believe that Hitchcock had conveyed to the company about $50,000 worth of real property for 56,000 shares, the remaining 54,000 being treasury stock that was being sold to raise money to build a bath house on the real property; when in fact the 56,000 shares had been issued without consideration and the company did not own any real estate, but plaintiff's $21,000 was used to take up options the company had on it.

Second, that the plaintiff's wife, as a stockholder, brought suit to require an accounting for the treasury stock, of 54,000 shares, and to require the 56,000 shares to be returned to the company by Hitchcock, on the ground.

that such shares were issued without consideration, and to enjoin any transfer thereof. Temporary injunction was issued, and was never dissolved, so far as this record shows. An accounting was made by Hitchcock, as to the treasury stock, and judgment entered against him in favor of the company for $24,308.59, which it was found he owed the company on treasury stock disposed of by him, but no adjudication, further than the injunction, was had as to the 56,000 shares. That during the pendency of that suit, Creighton and another were elected as two of the three directors, by voting the 56,000 shares, in disregard of the vote of the 21,000 shares of the plaintiff, in August, 1907; that in February following, the two directors aforesaid, having in the meantime taken possession of the books of the company and having assumed the absolute control and management of the company's affairs, plaintiff refusing to act, amended the by-laws, set a new date for annual meetings, and by the vote of the same stock, transferred, in the meantime to Creighton without consideration, elected three directors, consisting of Creighton and two others, who in March following, made a fraudulent assignment for the benefit of creditors; that plaintiff sued them and the assignee, alleging the fraudulent purpose of the assignment and asked an injunction against the assignee from further proceedings therein. Considerable evidence was introduced herein, tending to prove the fraudulent purpose of this assignment.

Third, that, in order to settle all differences between the plaintiff and Creighton, and to satisfy the plaintiff's rights and claims, Creighton proposed to plaintiff, and, it is alleged that he agreed, of plaintiff would desist from prosecuting his action against the assignee, and drop all other litigation, that he, Creighton, would organize a new company—after the assignment proceedings had been first closed, the property sold, and the assignee discharged—and have the purchaser at the assignee's sale transfer all the

property to the new company and have new shares issued to the plaintiff, to satisfy his rights, and to Creighton, and other stockholders to satisfy their rights, and to pay them for the money actually invested, and that he, Creighton, would build a $30,000 bath house, apparently from the sale of stock in the new company. That after the assignment was closed, and the property transferred to the new company, Creighton refused to go any further with the alleged contract, and refused to recognize the plaintiff's rights thereafter, but issued all of the shares in the new company to himself, except three shares, of one dollar each, one to ach of the three directors thereof, thus completely ignoring plaintiff, who was thus deprived of his money and of all interest in the property into which it had been converted.

These allegations were immediately followed by a closing statement in the complaint: "that *by said acts* of the said defendants and each of them this plaintiff has been damaged to the amount of $40,000." The court submitted the negotiations concerning the contract as a part of the "said acts."

Plaintiff introduced his testimony in the order of the allegations in the complaint, showing that he had been deceived in the purchase of the stock originally; that the defendant Creighton had oppressively and fraudulently used the 56,000 shares of stock, which it clearly appeared were issued without consideration to Hitchcock, and had been transferred to Creighton with such knowledge, and, by such use of it, he had thereby oppressively and fraudulently obtained absolute control and management of the company, and had fraudulently made the assignment for the benefit of creditors, and, through the negotiations concerning the contract, had lulled the plaintiff into security, and caused him thereby to refrain from pressing his suit against the assignee, and thereafter by the sale and transfer of property, had converted to his own use, and the use of the defendant company, all of the property of the old com-

pany, without paying anything to the plaintiff, or to anyone else, for it, except about $12,000 that was bid for the property at the assignee's sale, which was used to pay off indebtedness of the company, consisting of $5,000 due Creighton for claims allowed by the assignee and assigned to him, and of about $7,000 borrowed money and other claims and expenses. Thus showing plaintiff's damage, through and by reason of the various acts of fraud charged, and measured by the interest plaintiff had in the property so fraudulently obtained by the defendants, plaintiff obtained judgment for an amount much less than the value of the property, after deducting the $12,000 Creighton paid for it at the sale, and less than the value of his interest therein.

It is true the lower court instructed **the jury that** plaintiff had failed to prove an absolute **contract of settlement** and told counsel, on overruling a motion for judgment for the defendants and nonsuit, at the close of plaintiff's case, that he would submit the negotiations concerning the contract to the jury, and he did afterward so instruct them, for their consideration, in so far, only, as such negotiations would throw light upon the fraud charged against the defendants. The defendants, without objection to such statement of the court, proceeded to introduce their testimony in defense of the charges of fraud, and made no objection to the instruction, aforesaid, thus acquiescing in the ruling of the court, and accepting the issue thus made, upon the question of fraud. The verdict of the jury was against them for only $15,550, which the jury, no doubt, considered the actual value of plaintiff's interest in the property so taken from him by the defendants.

Thus it appears that the action was not for a breach of contract, and even if it were partially so, as originally stated in the complaint, the court narrowed and limited the issues to the one question of fraud, and submitted the negotiations concerning the contract for the jury's consideration as to the fraud charged against the defendants.

Such narrowing of the issues was not only a wise action on the part of the lower court, but was acquiesced in by the counsel for the defendants, as shown by three things: First, they denied in an amended answer, "that the defendant, Creighton, made the representations to the plaintiff alleged in paragraph 6," in reference to the contract, and denied "that the plaintiff did or refrained from doing any matter or thing whatever by reason of the alleged agreement or any agreement with the defendants"; thus aiding the complaint, and showing an actual joinder of issues concerning the effect of these negotiations; second, the defendants introduced their evidence on the issue of fraud, thus accepting such issue; third, the defendants made no objection whatever, and saved no exception, to the instruction of the court submitting the negotiations concerning the contract for whatever light they might throw upon the charge of fraud, thus acquiescing in the issue submitted.

All negotiations concerning the contract (which included Creighton's offer to pay and satisfy plaintiff, and to persuade him to drop his suit against the assignee and the directors who made the assignment, one of whom was Creighton, by the transfer to plaintiff of a sufficient number of shares in the new company to be organized) were pertinent facts, tending to prove a consequent admission of the fraud charged; an acknowledgment of plaintiff's rights and interests. If the 56,000 shares had not been fraudulently used to control the company, if the assignment was in good faith, why were these negotiations carried on, the purpose of which was to stop the suit against the assignee, and to settle with plaintiff? And if the negotiations were in good faith, why were they so completely repudiated after the defendants obtained the property? The court properly submitted these negotiations to the jury as part of the fraud charged.

Thus it not only appears that the non-suit was properly denied, but that the defendants waived the alleged error in

refusing it, although the majority opinion concludes that the overruling of the motion for a directed verdict and non-suit was sufficient to reverse the case.

The defendant, Creighton, stated in his answer that he did not have and could not obtain sufficient knowledge or information upon which to base a belief, as to the allegations, that he never did at any time own to exceed 220 shares of stock in the company. This must be taken as an admission that he never owned the 56,000 shares with which he obtained control of the company, and the court so instructed the jury, and defendants made no objection and saved no exception thereto.

The evidence for the defense consisted almost entirely in an effort to prove the necessity and validity of the assignment, and the proceedings therein terminating in the assignee's sale. They did put plaintiff on the witness stand, and he reiterated that he was deceived and fraudulently induced to buy the shares in the company; that the 56,000 shares were originally issued without consideration to Hitchcock, then to his brother Dean, and then to Creighton; that the assignment was illegal, and a majority of the claims filed in that proceeding were illegal; that the having of the 56,000 shares by Creighton at the annual meeting and his assuming control was one cause of his loss and damage, together with the testimony that he did nothing to hinder the assignee's sale, and that Creighton and the company now had all the property that was paid for with his money.

They did not put Creighton or any one of the directors of the defendant company on the stand. They ought to have been able to testify, if it were true, that they were not guilty of the fraud charged. They knew whether the 56,000 shares were fraudulently used to obtain control of the company and to make the assignment, and to thus obtain all the property of the company. Their failure to testify must have been considered by the jury. It was a circumstance far from favorable to Creighton, or to the three directors,

all of whom had been Creighton's attorneys in regard to matters involved in this suit.

The majority opinion concludes that the judgment should be reversed, because the court in stating the issues made by the pleadings made misstatements prejudicial to defendants.

The entire scope and purport of the complaint was to state facts constituting the fraud by which plaintiff was deprived, first of his money, and afterward of the property purchased with his money, and that the defendant Creighton had knowledge of those facts, did them himself, or consented to and approved them, and accepted the fruits thereof; and the instruction relied upon as reversible error was a general statement of the allegations as construed by the court, and could not have deprived the defendants of any substantial right. The same may be said as to the part of the 7th instruction, considered as reversible error, with the additional reason that defendants made no objection and saved no exception to it. They acquiesced in it. As to instruction No. 9, wherein the court included Creighton as a director making the $1500 loan, this was a mistake, as he was not a director then. It was quite immaterial, however, whether he assisted in making this loan; the charge was that it was made contrary to the by-laws of the company, and over protest. The jury could not have been misled by this very slight mistake. Furthermore, it is corrected by other instructions where it is plainly stated that Creighton first became a director in August, 1907, a year after the said loan; and, in another instruction, the directors' names are stated who made this loan. There was no such assuming of the existence of evidence here as referred to in the authorities cited in the majority opinion.

It is then concluded in the majority opinion that reversible error was committed in the same instruction by instructing that Creighton could not become a "director" under the by-laws without he owned 1000 shares, when the

allegation was that no one could become an "officer" without owning 1000 shares. The evidence disclosed that Creighton was a director and an officer—vice-president— elected by Hitchcock's voting the 56,000 shares for him before he even claimed to own but 220 shares. These are infinitesimal technicalities, and if the reversal of this judgment be based upon such errors, then it is doubly true that "mortal vision is a grievous bar to perfect judgment." It may be exhilarating and pleasing to exercise the mind and stimulate the ambition, in working out the enigmas of technical procedure, but it is "our pleasant vices that make instruments to scourge us."

The majority opinion says that "it does not appear that the transfer to Creighton of the 56,000 shares was without consideration nor merely colorable; therefore, *prima facie*, he had the right to vote the stock and act as a director, even though he was a merely nominal owner." But he admitted in the pleadings, and the court instructed the jury without his objection or exception, that he never owned to exceed 220 shares. This admission is clear and was certainly intentional, because an amendment was made to the answer for the specific purpose of denying, directly, allegations of the complaint, and this allegation was denied again on information and belief. The certainty of such intention to admit is shown by the fact that no objection was made to the instruction telling the jury such fact was admitted. Creighton did not testify at all, and he did not allege that they were ever paid for, and the plaintiff proved that the only way Creighton ever became a director was by the vote of these shares, over the vote of plaintiff's 21200 shares; and that by these shares another director who never owned 1000 shares was elected, constituting a majority of the board, and that these two changed the by-laws, set another date for an annual meeting, elected three directors at an annual meeting "held in accordance with the new by-laws," made an assignment for the benefit of creditors,

and thereafter sold the property and conveyed it to the new company, and issued all the stock therein to Creighton, except three shares. Now, where is the *prima facie* right even to act as a director, to say nothing of what he did thereafter?

Another error is found in the 9th instruction: that the court told the jury if they believed Creighton claimed to own the 56,000 shares, and at the same time knew that the same had not been paid for, and knew of the fraudulent representations of Hitchcock and the old company, such claim would constitute a fraud. The majority opinion says this was error, because "it is not alleged nor proved that Hitchcock did not cause the real estate to be conveyed to the company before he assigned the stock, or it came into the hands of Creighton." This was not error. The instruction is too favorable to defendants. They admitted that Creighton never owned these shares. Creighton did not allege, nor testify, that he did, but admits he did not; and, to the charge that he never owned to exceed 220 shares, he says in his answer that he did not have sufficient knowledge or information upon which to base a belief. Furthermore, he became a director and vice-president of the company, and acted as such, for about five months before he ever claimed to own but 220 shares, thus having ample knowledge of the company's affairs, and especially as to whether these shares had ever been paid for; for, before he voted them for himself and the other two directors, and while he was a director and vice-president, the judgment for $24,000 was obtained for the company against Hitchcock for the balance Hitchcock owed the company on his disposition of the 54,000 shares of treasury stock, rendered on a report of a referee that showed conclusively that Hitchcock had never paid the company anything for the 56,000 shares, but lacked $24,000 of having turned over property to the company as the equivalent of the 54,000 shares of treasury stock. Furthermore, the referee's report showed that

plaintiff's money had been used to pay for about all the property the company owned at that time. Furthermore, the complaint in that case alleged Hitchcock's fraud; and a director and vice-president would know of all the proceedings in a suit in which his company obtained a judgment for $24,000, and would know that Hitchcock never did transfer any property to the company for the 56,000 shares. And defendants do not deny in the instant case the allegations of Hitchcock's fraud, and that he never paid anything for these shares, but only deny that they knew it.

The majority opinion says this judgment of $24,000, *prima facie,* settled all issues in that case and "left the stock standing in the name of Hitchcock's assignees ,including Creighton." Now, Creighton never claimed these shares at that time; this judgment was obtained in January, and the only evidence indicating that these shares were ever even transferred to him was plaintiff's testimony from a memorandum that the books showed a transfer February 7, 1908, about 12 days after the judgment, and 3 days before Creighton voted them for himself, as director. So Creighton was not an assignee when the judgment was entered. As to the money judgment, *prima facie,* settling all issues, the record in that proceeding showed the contrary; after a temporary injuiction was issued as to any transfer of these shares, Hitchcock filed an answer, saying he had transferred the shares to his brother before he knew of the injunction; and the court appointed a referee, and ordered an accounting as to the 54,000 shares of treasury stock, and in such order all other issues were continued until the report of the referee was made, upon which the court rendered the judgment for $24,000, without any adjudication concerning the 56,000 shares, neither Hitchcock's brother nor Creighton being defendants.

And even if the 56,000 shares were left in Hitchcock's brother as assignee, there was no adjudication that he owned them or that they were not assigned without con-

sideration, but, on the contrary, no finding or adjudication was made concerning them; nor would such leaving of the shares in the said assignee's hands overcome the admission of Creighton that he never owned to exceed 220 shares, or his admission of the charge that Hitchcock never paid anything for them, coupled with his failure to testify on any issue.

The majority opinion says that the judgment should be reversed, because the court instructed the jury that if they believed all the matters or things set forth in the complaint were done by or with the knowledge and consent of Creighton, and in furtherance of Hitchcock's fraud upon plaintiff, they should find for the plaintiff. This was not error, first, because it was favorable to defendants. It required the jury to find that all of the matters and things were done to defraud the plaintiff; second, if Creighton adopted, carried on and used for his own benefit the fraud of Hitchcock, together with the things he did, on his own initiative, thereafter, the verdict should have been for the plaintiff; third, other instructions clearly define the issues so that this instruction is made clear to the jury.

The majority opinion says that the lower court, by instruction No. 10, committed fatal error "in that it did not give the proper measure, or any measure, of damages." One reason why such alleged omission to instruct was not reversible error is that the defendant did not ask for any such instruction, never objected to the instruction given for this reason, and never called the court's attention to the matter, but objected only on the ground that no instruction at all, as to damages, should have been given. It is true that there are instances where the court should give such an instruction, of its own motion, but this is not one of them. In the case of *Mustang Co. v. Hissman,* 49 Colo., 308, 112 Pac., 800, and *Colo. Spgs. Co. v. Albrecht,* 22 Colo. App., 201, 123 Pac., 957, cited in the majority opinion, there was a clear dispute at the trial as to the proper measure

of damages, and a proper instruction was refused, and the issue was the amount of damages actually sustained. In such instances the court should guide the jury by appropriate instructions. In the present case the contention of defendants is, and was at the trial, that no damage was sustained and none proved. Furthermore, if the court had given to the jury such an instruction it could not have caused the jury to find a verdict for a less amount under the evidence.

There was no reversible error pertaining to the answer of the jury to the special interrogatory, for two reasons: First, the answer discloses only one way in which plaintiff was damaged, if it discloses any way that he was *damaged*, and is not, therefore, inconsistent with the general verdict. The answer discloses one of the ways in which the plaintiff was defrauded rather than damaged, but two more charges of fraud were made upon which the verdict may stand. If the answer does not exclude every other conclusion that will authorize a recovery for the plaintiff, then it is not inconsistent with the general verdict; and if not inconsistent, the general verdict should stand. 2 Thompson on Trials, 1958 (2nd Ed.) ; *Drake v. Justice G. M. Co.*, 32 Colo., 260, 75 Pac. 912. The special findings will not control the general verdict "unless invincibly antagonistic to it." Thomp. on Tr., 1962, 1967; *D. & R. G. R. R. Co. v. Bedell*, 11 Colo. App., 140, 54 Pac., 280. Second, the interrogatory was confusing and misleading, as the answer shows. If the question had been how was the plaintiff defrauded, it would have been responsively answered in part. But that was not the question, and the answer was therefore indefinite. The question propounded was intended to elicit a different response. Counsel should have required the jury to answer it, if possible. The question was confusing also because it did not call for a "particular question of fact," as the Code provides. Special findings of facts by a jury are often wise precautions, but in order that they may not be used to con-

fuse and to furnish error, they should be made only as to definite and particular questions of fact, and not as to the evidence on which a question of fact is based.

The majority opinion concludes that the defendants were denied a substantial right because the trial did not proceed in all respects in compliance with the orderly procedure designed for the purpose of making up issues for trial and for the conduct of trials. The trial of this cause required about nine days in the lower court, and there are in the record many instances that required discretion, but the only actual deviation from reasonable regularity consisted in the action of the lower court in submitting to the jury the consideration of the negotiations concerning the alleged contract; but, as has been shown, this was a wise and reasonable thing to do, and counsel for the defendants acquiesced in it. Furthermore, the statute provides, in reference to appeals, that the Supreme Court "shall disregard any error or defect in the pleadings which shall not affect the substantial rights of the parties, and no judgment shall be reversed or affected by reason of such error or defect." Sec. 20, Sess. Laws 1911, Ch. 6. The entire purpose of that act was to facilitate the speedy determination of causes and to lessen, if not prevent, the reversal of causes for technical reasons. Few provisions of the statute have been so frequently cited, and so infrequently obeyed. The re-enactment in 1911 of that statute is a plain reminder that a similar statute, that had been in existence since 1877, had not been receiving the attention that the legislature intended. Technicalities should never be used to reverse a just judgment. The reversal of this judgment, in my opinion, cannot be based upon anything except that it was not found according to certain rules. In a very recent case, *Taylor v. Thomas,* 77 N. H., 410, 92 Atl., 740, the Supreme Court of New Hampshire said:

"It is now universally recognized that the object of a trial is to ascertain the truth by rational means. The sport-

ing theory—the theory that a judicial trial is a game to be played according to certain rules—has no more place in the present conception of the administration of justice than has the wager of battle."

Just judgments are too frequently reversed because learned members of the bar boldly assert some technical rule, and so plausibly maintain it with citations and argument, based upon iron clad rules handed down to us from past ages, that the courts, sometimes in fear of reversal by a still higher tribunal, sometimes from the mistaken belief that it is the law, and. in some few instances from a lack of extended consideration, adopt such technical precedents and reverse just judgments because they were not recovered with that degree of nicety, science and art that does sometimes so adorn judicial procedure that even an unjust judgment is permitted to stand.

The majority opinion concedes that something might have been done by the lower court to permit the plaintiff to share in the stock of the new company; but plaintiff was not compelled to sue for a part of such stock, and the lower court sustained a money judgment, as sued for, which conferred the same benefit, and which defendants seemed to prefer, by acquiescing in the issues.

It is true, as the majority opinion indicates, that the record contained intimations of plaintiff's ignorance. It clearly shows, also, his innocence; that he was not a shrewd man; that he knew nothing about the law, and that he was easily influenced and without ingenuity; "there are no tricks in plain and simple faith."

Remanding for another trial means further expense to plaintiff, the necessity of delay, another opportunity for defendants to defeat a just cause, simply to require a more rigid enforcement of the technical rules of pleading and practice. Such rules, like the statute of frauds, have been adopted to prevent fraud and injustice, not to permit and promote them.

In 1 Thompson on Corporations, sec. 870, it is said:

"For the clearest reasons, the officers of a corporation will not be permitted to issue the stock belonging to the company to themselves, with the design and for the purpose of retaining themselves in office. * * * So, directors were enjoined from issuing new stock immediately prior to an election for the sole purpose of controlling it. * * * They show a clear case of fraud upon the rights of the existing stockholders."

For a much greater reason, is it fraud for directors to elect themselves by the vote of shares that have never been paid for, with their knowledge.

Fraud is not readily classified or defined and the courts usually avoid attempting it; it "is so various in form and color that it is difficult, if not impossible, to confine it within the limits of any precise definition." Kerr on **Fraud** and Mistake, page 42.

This author further says:

"The fertility of man's invention in devising new schemes of fraud is so great, that courts of equity have declined the hopeless attempt of embracing in one formula all its varieties of form and color, reserving to themselves the liberty to deal with it under whatever form it may present itself."

In the case of *Hanger et al. v. Evine et al.*, 38 Ark., 334, 346, the court said:

"The criterion is the good sense of the jury, estimating the character of the transaction by applying to the evidence their general knowledge of human motives, and their sense of dealing. Fraud is manifold in its devices, and its ingredients cannot be so defined as to include all cases, save by such general statements as must, after all, refer the question to the judgment of the jury upon the facts. Twelve men, taken from the mass of citizens, will rarely fail to detect a fraudulent intent, if any such existed, from all the circumstances."

In the case of *Kirby v. Ingersoll,* 1 Har. Ch. 172, 190, a case in which one partner, without the consent of his copartner, made an assignment for the benefit of creditors, the court said:

"By the term fraud, it should be remembered that the legal intent and effect of the acts complained of is meant. The law has a standard for measuring the intent of parties, and declares an illegal act, prejudicial to the rights of others, a fraud upon such rights, although the parties deny all intention of committing a fraud."

Creighton's failure to testify had its weight with the judge and jury.

"The failure of a party to testify in his own behalf as to disputed matters within his personal knowledge warrants the inference that his testimony would be unfavorable to his contention on those points."   9 Enc. Ev. 969.

*"Where a party is charged with fraud* and fails to come forward and testify to repel the charge, he generates by his failure an unfavorable presumption against his cause." *Stephenson v. Kilpatrick,* 166 Mo., 262, 65 S. W., 773.

"When it is reasonably within the power of a party to offer evidence upon the facts and rebut the inferences which the circumstances tend to establish against him, and he fails to offer such proof, to rebut same, the natural conclusion is that the proof, if produced, would support the inferences against him, and the jury is justified in acting upon that conclusion." *A. T. & S. F. Ry. vs. Davis et al.,* 26 Okla. 359, 364, 109 Pac. 551, 553.

I think a reasonable and fair administration of justice demands the affirmance of the judgment.

Decided February 11, A. D. 1914.  Rehearing granted April 12, A. D. 1915. Judgment reversed. Rehearing denied appellee June 18, A. D. 1915.